USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  November 21, 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
IRON WORKERS LOCALS 40, 361 & 417
HEALTH FUND.,

             Plaintiff,

               -against-

ROBERT DINNIGAN, as Father and Natural
Guardian of AMANDA DINNIGAN, an Infant;
THE AMANDA C. DINNIGAN SUPPLEMENTAL
NEEDS IRREVOCABLE TRUST; ALAN SHAPEY;
and LIPSIG SHAPEY MANUS & MOVERMAN, P.C.,

             Defendants.
--------------------------------------------------------X

12 Civ. 2566 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

      This is a dispute between an employee health and welfare benefits plan, subject to the

Employee Retirement Income Security Act (ERISA, 29 U.S.C. § 1002 et seq), and a plan

beneficiary who has recovered plan-paid medical expenses from a third party tortfeasor.  The

Health Plan seeks reimbursement of the full amount of medical expenses it paid out on behalf of

the beneficiary: almost $1.7 million.  The plan beneficiary argues that the plan has no claim to

recover, or, in the alternative, the Plan is entitled to a substantially reduced percentage of the

recovery.

      Plaintiff Iron Workers Locals 40, 361, & 417 Health Fund (the "Fund" or the "Plan")

sues one of its members, Robert Dinnigan, as father and natural guardian of Amanda Dinnigan,

the Amanda C. Dinnigan Supplemental Needs Irrevocable Trust and the attorney who represents

the Dinnigans.  The Plan seeks equitable relief under ERISA, 29 U.S.C. § 1132(a)(3), including

restitution, imposition of a constructive trust and a declaration of its rights under ERISA and the

Fund's Summary Plan Description ("SPD").  Defendants have moved to dismiss, and in the

alternative for summary judgment.  Plaintiff has responded and cross-moved for summary

judgment.

## I.      <u>BACKGROUND</u>

Defendant Robert Dinnigan, a union iron worker, received medical coverage from his

Union Health Fund pursuant to his employment.  Mr. Dinnigan's daughter, Amanda Dinnigan,

was horribly and permanently injured in a single-vehicle automobile accident[1] on February 21,

2007 when she was seven years old.  Amanda received spinal cord and other injuries; she is a

quadriplegic, and completely insensate below her jaw, requiring a ventilator to breathe and a

shunt to control hydrocephalus.  She requires round-the-clock nursing care and has needed

emergency hospital treatment several times since her initial four-month hospitalization following

the crash.  Amanda's injuries are permanent, and her medical expenses have been estimated to be

in excess of $500,000 per year.  Def. Rule 56.1 Stmt at Ex. B.

Amanda is covered as a dependent of Mr. Dinnigan under the Health Fund.  The Health

Fund has paid for $1,692,371.76 of Amanda's medical care since the accident occurred.

## II.     <u>FACTS</u>

The Health Fund is an employee benefit fund, as defined by Section 3 of ERISA, 29

U.S.C. § 1002 et seq.  The Fund covers hospital expense benefits, medical expense benefits,

prescription drug expense benefits, dental expense benefits, optical expense benefits, hearing aid

expense benefits, disability expense benefits, death expense benefits, accidental death and

dismemberment expense benefits, and vacation benefits.  The SPD details the benefits of the

Health Fund, and informs participants and beneficiaries of their rights under the Health Fund.

---

[1] Amanda was a passenger in a car driven by her mother when the car struck a tree.

All participants receive a copy of the SPD.  The Plan covers union members such as Mr.

Dinnigan and his dependants, including his daughter Amanda.

In March, 2007, Mr. Dinnigan brought suit in the Supreme Court of New York, Suffolk

County, on behalf of Amanda against General Motors ("GM")[2], a number of interrelated entities

doing business under the name Takata, Bright Bay GMC Truck, Inc. ("Bright Bay"), and Daniel

Coll[3].  GM had designed and manufactured the vehicle that Amanda was riding in at the time of

the accident.  GM was also the manufacturer of the third row seat belt system included in the

vehicle.  The Takata defendants supplied component parts of the seat belt system and assisted

GM in its development.  Bright Bay is the vehicle's dealer-seller, and Daniel Coll is Amanda's

uncle and the owner of the vehicle.  The Dinnigans' complaint alleged that the defective design

of the seat belt system caused Amanda's severe injuries.  The case involved ten expert witnesses,

as well as extensive discovery consisting of more than 80,000 documents along with dozens of

videotaped crash tests.  Plaintiff incurred over $975,000 in court-approved expenses in

prosecuting this action.

The Dinnigans settled Amanda's claim against Bright Bay at a mediation on or about

November 2, 2010 for $8,000,000, which was approved by the Supreme Court, Suffolk County

on February 18, 2011.  The claim against GM was resolved through a mediation process

instituted by the Bankruptcy Court.  GM agreed to assign a value of $14,000,000 to Amanda's

claim, converting it from an unliquidated, unsecured claim to an allowed unsecured claim.  Due

to GM's bankrupty, however, Amanda has only received approximately $3.56 million of this

amount, although it is possible that she may receive more money in the future.  See Defendant's

---

[2] General Motor Corporation filed for bankruptcy on June 1, 2009, which had the effect of staying the action for a number of months.
[3] GM, Takata, Bright Bay GMC Truck, Inc., and Daniel Coll will be referred to collectively as the "Third Party Tortfeasors."

Motion for Judgment on the Pleadings or for Summary Judgment at Ex. E ("Def. Summary Judgment Motion").  After approximately thirty days of trial from September-November, 2011 in New York State Supreme Court, the Dinnigans settled their case against the remaining Takata and Coll defendants for $2.6 million.  The total recovery, before attorney's fees, is approximately $14.16 million.

The Health Fund has paid for most of Amanda's medical care since the accident.  In connection with Dinnigan's settlement agreement with Defendant Bright Bay, the Health Fund was permitted to intervene in the personal injury action brought on Amanda's behalf.  The Health Fund claimed that it was entitled to reimbursement of more than $1.2 million in healthcare expenses out of any recovery from third party tortfeasors obtained for Amanda's benefit.  The Dinnigans disputed the Health Fund's claim, and were directed by the court to place $1.2 million in an escrow account, pending the approval of a proposed Infant's Compromise Order and a determination by the Supreme Court as to what rights, if any, the Health Fund had to reimbursement from the Dinnigan's settlement funds.

Following the settlement with Takata and Coll in November 2011, the Health Fund claimed it was entitled to an additional payment of more than $480,000 from the proceeds of Amanda's settlements, bringing its total claim to approximately $1.7 million.  The Suffolk County Department of Social Services had a medicaid lien for the $367,741.63 of Amanda's medical expenses it covered.[4]  In addition to the settlement of the Suffolk County claim, the

---

[4] The Health Fund in effect at the time of Amanda's injury had a $1,000,000 lifetime cap on medical payments to any individual.  When this cap was met, Amanda applied for Medicaid benefits administered by the Suffolk County Department of Social Services ("SCDSS").  The enactment of the Affordable Care Act ("ACA") eliminated lifetime caps on medical benefits plans.  The Health Fund amended its plan terms to eliminate its $1,000,000 lifetime cap.  Amanda had incurred $367,741.63 between the time that the Health Fund stopped paying for Amanda's medical care, and the time when it resumed responsibility as a result of the ACA.  The SCDSS claimed a statutory lien of $367,741.63 against Amanda's recovery, seeking a pro rata share for its reimbursement, as determined by its evaluation of the settlement in relation to the "full value" of the damages.  SCDSS assessed the full value of

Takata/Coll settlement also provided: (1) Robert Dinnigan, as Trustee of the Amanda Dinnigant Supplemental Needs Trust, post a $5,000,000 bond; (2) payment of counsel fees and disbursements as set forth in the petition be approved[5]; (3) the Takata and Coll settlement funds be deposited in a separate escrow account; and (4) that a final order of compromise be submitted, which shall provide for the release and distribution of the funds already on deposit in the existing escrow account, to the Amanda Dinnigan Supplemental Needs Trust.  The state court further determined that it did not have subject matter jurisdiction over the Health Fund's claim for reimbursement, resulting in the Fund bringing this action in federal court.

### III.   **DEFENDANTS' ARGUMENTS**

Defendants' Motion to Dismiss or for Summary Judgment (Def. Br. (1)[6] argues: (1) the Health Fund's benefits are insured by Empire Blue Cross Blue Shield, and therefore are subject to New York state law regulating insurance—including state anti-subrogation statutes, collateral source laws, or rules that would bar any reimbursement claim as a matter of law; (2) the terms of the Health Fund fail to meet the requirements supporting a cause for "equitable"—as opposed to "legal"—relief under ERISA § 502(a)(3)[7]; (3) the Plan language fails to create any rights exercisable against the Defendants, and is otherwise so ambiguous and indefinite as to require application of common-law rules and canons of construction that bar any enforcement action

---

Amanda's claim at $37,000,000, and because her settlement against Bright Bay amounted to only 21% of that total ($8 million), SCDSS agreed to accept 21% of the amount of its lien in satisfaction thereof: $79,511.70.

[5] Dinnigan's legal fees totaled $687,396.75 and disbursements were $308,677.50.

[6] The parties additional filings will be referred to as follows: Plaintiff's Memorandum in support of its Cross Motion for Summary Judgment and in Opposition to Defendants' Motion to Dismiss Plaintiff's Complaint or in the Alternative for Summary Judgment will be cited as "Pl. Br. (2)"; Defendant's Memorandum in support of its Reply to Plaintiff's Opposition to Defendants' Motion to Dismiss or for Summary Judgment and in Opposition to Plaintiff's Cross-Motion for Summary Judgment will be cited as "Def. Br. (3)"; and Plaintiff's memorandum in support of Plaintiff's Cross-Motion for Summary Judgment and Opposition to Defendants' Motion to Dismiss Plaintiff's Complaint or in the Alternative for Summary Judgment will be cited as "Pl. Br. (4)."

[7] A fiduciary may bring a civil action under § 502(a)(3) of ERISA "(A) to enjoin an act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

here; (4) any claim under ERISA § 502(a)(3) is limited to equitable relief that is "appropriate" and does not unjustly enrich a health plan at its beneficiary's expense; and (5) the Health Fund cannot impose a lien or constructive trust on funds that are not in the possession or control of a defendant plan beneficiary.

## IV.    PLAINTIFF'S ARGUMENTS

Plaintiff responds that state law does not apply to regulate the Health Fund, since the Health Fund is self-insured and Amanda's medical, hospitalization, and pharmaceutical benefits were provided solely from the plan's assets (accumulated under the provisions of the CBA and held in a Trust Fund for the purpose of providing benefits to covered participants). While Empire Blue Cross/Blue Shield provides services, it is an "Administrative Services Only" ("ASO") arrangement, whereby Empire's sole duties include processing hospitalization claims (investigating and reviewing claims to determine what amount, if any, is deemed payable according to the terms and conditions of the SPD). Plaintiff denies that any medical, hospitalization, or pharmaceutical benefits were paid for by an insurance company. Next, Plaintiff contends that it is pursuing an equitable claim for relief under ERISA § 502(a)(3), not a legal remedy. Third, the two applicable SPDs, 2000 and 2008, clearly provide that the Health Fund is a subrogee for any and all recoveries from third party tortfeasors. Fourth, the relief sought here was always in the clear contemplation of all parties and recovery of its legitimate contributions to cover Amanda's necessary medical expenses is neither a windfall nor inappropriate. Finally, the funds the Health Plan seeks are clearly available.

### V.   <u>**LEGAL STANDARD**</u>

The facts and legal questions raised by the Defendants' Motion to Dismiss and their

Motion for Summary Judgment, as well as Plaintiff's Cross-Motion for Summary Judgment are

the same, and summary judgment may be granted when the "pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

To defeat the motion, the nonmoving party must "set forth specific facts showing that there is a

genuine issue for trial." <u>McAvey v. Orange-Ulster BOCES</u>, 805 F.Supp.2d 30, 38 (S.D.N.Y.

2011) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986)). The court considers

the evidence in "the light most favorable to the non-moving party and draw all reasonable

inferences in its favor, and may grant summary judgment when no reasonable trier of fact could

find in favor of the nonmoving party. <u>Id.</u> (citing <u>Allen v. Coughlin</u>, 64 F.3d 77, 79 (2d Cir.

1995)). If there is evidence in the record that could reasonable support a jury's verdict for the

nonmoving party, then summary judgment is improper. <u>Marvel Characters, Inc. v. Simon</u>, 310

F.3d 280, 286 (2d Cir. 2002).

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure (Fed.R.Civ.P. 12(b)(6)), "a complaint must contain sufficient factual matter, accepted

as true, to state a claim to relief that is plausible on its face . . . The plausibility standard . . . asks

for more than a sheer possibility that a defendant has acted unlawfully." <u>Galiano v. Fidelity Nat.,</u>

<u>Tiotle Ins. Co.</u>, 684 F.3d 309, 313 (2d. Cir. 2012) (citing Ashcroft v. Iqbal*, 556 U.S. 662, 678,

129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). A plaintiff must assert "enough facts to state a claim

to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).

VI.     **DISCUSSION**

**A.  Standard of Review for ERISA Claims**

At issue are two separate SPDs disseminated by the Health Fund: the SPD issued in 2000 ("the 2000 SPD") and the SPD issued in 2009, but retroactively applicable to all claims after January 1, 2008 ("the 2008 SPD[8]").  Both SPDs contain sections governing the potential subrogation of Defendant's claims:

> In consideration of any benefit payments made by the Plan, an employee or dependent shall subrogate (assign) to the Plan his or her right of recovery against any person or organization and any action in tort to the extent of the amount of such employee's or dependent's claim.  In other words, if someone negligently injures you and the Plan provides you with benefits to care for that injury, you must reimburse the plan for whatever you recover from the wrongdoer.

The 2008 SPD goes further, and expressly repudiates the common law "made-whole doctrine" ("Made-Whole" Doctrine").[9]

> The allocation of the proceeds of any recovery will be paid from the first dollar of any proceeds received and will have priority over competing claims, regardless of whether the total amount of your recovery is less than the actual loss suffered, or less than the amount necessary to make whole.  The [Health] Fund's rights will not be defeated or reduced by the application of any "Made-Whole Doctrine" . . . or any other doctrine purporting to defeat the [Health] Fund's right by allocating the proceeds exclusively, or in part, to non-medical expense damages.

2008 SPD at 40.

---

[8] Defendants refer to the revised SPD as the "2009 Plan."  Plaintiffs refer to the same document as the "2008 Plan." The third page of the letter to participants from the Board of states that "[t]his is your new and updated Health Fund booklet, which sets forth the plan of health and vacation benefits to which you and your Dependents are entitled, **effective January 1, 2008.**  This booklet replaces and supersedes and prior booklets summarizing your benefits from the Fund."  Sabbagh Decl. at Ex. A (emphasis added).  While the transmitted letter is dated January, 2009, the effective date is 2008, and the Court will refer to the document as the "2008 SPD."

[9] The Made-Whole Doctrine is the common law concept that an insurer's claim for subrogation or reimbursement against its insured will fail unless the insured has otherwise been "made whole" through a third-party recovery.  See e.g., USF&G v. Maggiore, 299 A.D.2d 341, 344 (2d Dep't 2002).  See infra for a discussion of the applicability of the "Made-Whole" Doctrine to Plaintiff's claim.

Both the 2000 SPD and the 2008 SPD specify that the Plan Administrator is vested with discretionary authority to interpret the Health Plan's provisions:

> In carrying out their respective responsibilities under the Plan, the Plan Administrator, and other Plan fiduciaries and individuals to whom responsibility for the administration of the Plan has been delegated, will have discretionary authority to interpret the terms of the Plan and to determine eligibility and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination under such discretionary authority will be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

The Supreme Court, in Firestone Tire & Rubber Co. v. Bruch, "established the rule that courts must apply a de novo standard of review in actions brought by ERISA plan participants to challenge the denial of benefits *unless* the plan vests the plan administrator with discretionary authority to make eligibility determinations or construe the plan's terms. Sunbeam-Oster Co., Inc. Group Benefits Plan for Salaried and Non-Bargaining Hourly Employees v. Whitehurst, 102 F.3d 1368, 1373 (emphasis supplied) (citing Firestone Tire & Rubber CO. v. Bruch, 489 U.S. 101, 115 (1989)).  Defendants argue that the standard established in Firestone is limited to denial-of-benefits claims made by beneficiaries under ERISA § 502(a)(1)(B), and is not applicable to plan enforcement claims brought under ERISA §502(a)(3).  Defendants cite In re Unisys Savings Plan Litigation to support the argument that "Firestone was intended to address the standard of review only under ERISA §502(a)(1)(B) . . . not under other remedial provisions where de novo review is appropriate."  173 F.3d 145, 154 (3rd Cir.1999).  In Unisys, however, the court held that the Firestone standard is applicable when a case concerns a denial of benefits claim under § 502(a)(1)(B), *or* an interpretation of a Plan.  Since this case involves an interpretation of the 2000 and 2008 SPDs, the Court will apply an arbitrary and capricious standard or abuse of discretion standard.

**B.  The Plan is Self-Insured and is Not Insured by Empire**

Section 514(a)[10] of ERISA preempts all state laws that "relate to"[11] an employee benefit plan governed by the statute, except when the state regulates insurance.  ERISA 514(b)(2)(a)[12]. Unless Defendants demonstrates that the Fund is insured (as opposed to self-funded), New York's anti-subrogation rules[13] will be preempted.

Defendants point to language in the 2000 and 2008 SPDs, stating that the Plan was insured by Empire Blue Cross/Blue Shield, a New York insurer.  The 2008 SPD, under the heading "Type of Administration for Insured Benefits", states that "[h]ospital benefits are insured by Empire BlueCross."[14]  Based on this language, Defendants contend that "even though this hospital coverage was provided as a benefit of employment – and therefore subject to ERISA – it is clear that state laws regulating insurance are fully applicable to such insured health plans, as state insurance regulations are specifically saved from preemption . . ."  Def. Br. (1) at 6.

---

[10] Section 514(a) states that "[e]xcept as provided in subsection (b) of this section [the "savings clause," discussed infra], the provisions of this subchapter . . .  shall supersede any and all State laws insofar as they may be now or hereafter relate to any employee benefit plan [subject to ERISA regulation].

[11] The Supreme Court has ruled that pursuant to ERISA, a state law "relates to" an employee benefit plan "if it has a connection with or reference to such a plan." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983).

[12] A state law regulates insurance if it satisfies two requirements: (1) "the state law must be "specifically directed toward entities engaged in insurance; [and] [(2) "the state law must substantially affect the risk pooling arrangement between the insurer and the insured." Kentucky Ass'n of Health Plans, Inc. v. Miller, 538 U.S. 329, 342 (20033 (citing Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 50 (1987)).

[13]  Defendants cite to New York statutes they argue should apply to govern the subrogation claim.  On the argument/assumption that the Fund is insured by Empire, Defendants claim that ERISA does not preempt state law, and the Fund is subject to New York state law regulations.  Defendants argue that the following New York insurance regulations are applicable if the court finds that the Fund is fully-insured by Empire: New York General Obligation Law §5-335 ("NY GOL § 5-335), New York Civil Practice Law and Rules § 4545 (NY CPLR § 4545), and the New York Made-Whole Doctrine.  As the Court determines, however, that the Health Fund is a self-funded expense plan and is not insured.

[14] 2008 SPD at 14.

Plaintiff responds that the quoted language is a drafting error, in fact the Health Plan provides self-insured benefits derived from authorization made pursuant to a collective bargaining agreement.  Plaintiff submits an affidavit from Brian Sabbagh, the Fund Administrator, which states that "the medical, hospitalization, and pharmaceutical benefits provided to Amanda Dinnigan by the Health Fund are self-insured benefits."  Further, he states that "the Health Fund does not purchase insurance premiums from an insurance company for medical, hospitalization, or pharmaceutical benefits."  Sabbagh Decl. ¶¶ 13-14.  Empire Blue Cross/Blue Shield provides "Administrative Services Only" ("ASO") under the terms of an arrangement for the processing of hospitalization benefits.  Id. at ¶16.  Empire Blue/Cross Blue Shield's sole responsibility for the Health Fund was the processing of hospitalization claims, including "investigating and reviewing claims to determine what amount, if any is deemed payable according to the terms and conditions of the SPD."  Id. at ¶17.  Sabbagh explains that, according to the terms of the 2000 SPD, hospitalization benefits were fully-insured.  The Trustees changed the hospitalization funding of the Plan in October, 2003, and Empire Blue Cross/Blue Shield notified Fund participants at that time of the Fund's new self-insured status with regard to hospitalization benefits.  The back of the ID card distributed to Plan beneficiaries was changed to reflect that the Fund "self-insures" the hospitalization benefits.

Mr. Cahill, an employee of Empire Blue Cross/Blue Shield affirms that, at all relevant times, the Fund utilized the services of Empire under the terms of an ASO agreement for the processing of hospital benefits pursuant to the SPD.  Cahill claims that after February 2007 Empire Blue Cross/Blue Shield did not underwrite or assume any financial risk with respect to the Fund's claims liability with regard to hospital benefits.  Cahill Decl. ¶¶2-3.  Cahill states that the Fund notified participants of the changes in hospitalization benefit funding in an October

2003 letter; and that the change was reflected in a new ID which notified participants that the Fund "self-insures" hospital benefits.  See Cahill Decl. at Ex. A.  Based on these declarations, Plaintiff argues that, even though the 2000 SPD was never updated to reflect the change to self-funding; and the Fund subsequently failed to adequately revise the 2008 SPD to note the change in funding, Defendants were adequately advised of the change by the October 2003 letter and the information printed on the back of their ID card.

Defendants argue that the Sabbagh and Cahill Declarations are directly contradictory to the language in the 2000 and 2008 SPDs, and as such, must be disregarded, since "self-serving and contradictory affidavits cannot defeat a motion for summary judgment."  Def. Br. (3) at 6 (citing Lee Loi Industries, Inc. v. Impact Brokerage Corp., 473 F.Supp.2d 566, 570 (S.D.N.Y. 2007)).  Defendants argue that the page in the 2008 SPC cited by Sabbagh as proof of self-funding states that the "hospital benefits are insured by Empire Blue Cross" and does not mention any ASO agreement.  Defendants also argue that the purported October 2003 letter from Empire Blue Cross/Blue Shield  (Cahill Decl. at Ex. A) is "wholly unauthenticated and of completely unknown provenance, with no proof that it was ever authorized by the Health Fund, that any such plan modifications had been made, or their effective date . . . [and] it was never produced in discovery and is otherwise plainly excludable as hearsay under Fed. R. Evid. R. 802."  Br. (3) at 8.

Plaintiff responded that even where an affidavit contains contradictory information, where the party's "conflicting affidavit statements are corroborated by other evidence, the affidavit may be admissible, since the concern that the affidavit is a 'sham' is alleviated."  Gilani v. GNOC Corp., No. 04-cv-2935, 2006 WL 1120602, (E.D.N.Y. April 26, 2006).  In further support, Plaintiff attaches a Declaration from Darrin Owens, a Senior Vice President at the Segal

Company and the "Plan Consultant" for the Fund.  Owens Decl. ¶1.  As Plan Consultant, Owens states that he is responsible for advising Trustees of updates in the law, drafting SPDs and any amendments, and advising the Fund with regard to the cost estimates of benefits.  Owens confirms Sabbaugh and Cahill's declarations: that in October 2003, the Fund changed the funding of hospitalization benefits to be self-insured.  Id. at ¶3.  Prior to that time, the hospitalization benefits were insured by Empire Blue Cross/Blue Shield.  Id.  Owens states that he located a notice from Empire informing "participants and dependents that 'the back of the ID card had been changed to reflect that the Fund 'self-insures' these benefits . . .'"  See Owens Declaration at Exhibit A.  Owens explains that the Segal Company, at the request of the Trustees, drafted an amendment to the Fund to clarify the SPD language to reflect the change from an insured to self-insured hospital benefit that went into effect on October 1, 2003.  The amendment was presented by Owens to the Trustees at a quarterly meeting and adopted by the Trustees on June 26, 2012.

Plaintiff has successfully demonstrated that the Plan was self-funded as of 2003, and that Plan participants were so notified.  Even though the SPD was inaccurate post-October 2007, this inaccuracy cannot change the single salient fact concerning the Fund: it was self-insured.  The Cahill and Sabbagh declarations confirm that the Fund was self-insured as of October 2003; and beneficiaries were notified through the issuance of a letter, along with an identification card describing the benefits provided by the Fund as self-insured.  The Trustees' failure to modify the language of the SPD does not change the substance of the arrangement: self-insured.  The Fund cannot be bound by the erroneous statement in the SPD regarding the nature of the Fund, where the facts show that the Fund is self-insured.  The Defendants have failed to provide any evidence that these declarations are false.  Other than the admittedly inaccurate SPD language, Defendants

have not produced any proof that the Health Fund was insured by Empire Blue Cross/Blue

Shield.  The Court finds that the Fund has been self-insured since October 2003.  Since the Plan

is self-funded, ERISA preempts New York State law[15] regulating insurance, and therefore NY

CPLR § 4545 and NY GOL §5-335 are inapplicable.  Protocare of Metropolitan N.Y., Inc. v.

Mutual Ass'n Administrators, Inc., 866 F.Supp. 757, 760 (S.D.N.Y. 1994) (citing FMC Corp. v.

Holliday, 498 U.S. 52, 61 1990)) ("The Supreme Court has concluded . . . 'State laws that

directly regulate insurance . . . do not reach self-funded employee benefit plans.'  Because the

NCA Plan is self-funded, New York's insurance laws do not apply.").

### C.  The 2008 SPD Governs the Plan's Medical Expense Payments from 2008-2011

Defendants argue that the 2000 SPD, which was in effect at the time of Amanda's injury

in February 2007, should apply to govern the Fund's right to reimbursement.  Plaintiffs contend

that the 2008 SPD which was in effect at the time that the Fund paid Amanda's medical

expenses, should apply to all of Amanda's medical expenses paid by the Fund in 2008-2011.

Defendants rely principally on Waupaca Foundry Inc. v. Gehlhausen, 104 F.Supp.2d

1052 (S.D.Ind. 2000), which dealt with a dispute over subrogation where the injury occurred

under one plan (but before the benefits took effect) and benefits continued following the issuance

of an amended plan.  The court held that:

> In a case where the participant had already received benefits under an
> ERISA plan, the Seventh Circuit has refused to apply an amendment
> which was made (as here) prior to the plan's claim for subrogation and
> reimbursement. ... No principle of contract law allows a party to
> unilaterally modify the extent of its own rights, and the plan's amending
> power cannot be used "to force plan participants and beneficiaries to
> return benefits already received and spent."

---

[15] See supra at 10-11 n. 12 for a discussion of the New York state insurance law Defendants contend should be
applicable in this case.

Id. at 1056.  The Waupaca court found that the benefits vested at the time of the injury because a reading of the 1993 plan "suggests that the injury, not the expense, is the event that would trigger coverage."  Id. at 1055.  Since the benefits vested at the time of the injury, (and before the amendment took effect), the court found that the 1993 plan applied.  Id.

Plaintiff argues that the language[16] of the 2008 Fund unequivocally establishes the Fund's right to recover and be reimbursed from the third-party tort settlement for medical expenses that were incurred in 2008-2011.  Plaintiffs argue that the Health Plan covers medical expenses, where the benefits vest when the expenses are incurred.  The Plan which is in effect at the time of vesting is the controlling plan.

The Waupaca court recognized the difference between injury and illness benefits which vest at the time of illness, and expense benefits which do not vest until expenses are incurred.  In Electro-Mech. Corp. v. Ogan, 9 F.3d 445 (6th Cir. 1993), the court held that where a benefit plan had been amended to include subrogation language, this amended plan should govern the plan administrator's reimbursement claim for the costs of medical expenses paid from the amendment's effective date onward.

Other courts have made clear that a beneficiary's rights in an expense plan do not vest at the time of the beneficiary's injury.  In Grosz-Salomon v. Paul Revere Life Ins. Co., 237 F.3d 1154 (9th Cir. 2001), the court held that the fact that a beneficiary became permanently disabled and filed her disability claim while the first version of the benefit plan was in effect is "irrelevant; it does not entitle her to invoke that plan's provisions in perpetuity."  Id. at 1160.  Even when courts have held that an earlier version of a benefit plan should apply in lieu of the amended plan, the courts have

---

[16] The 2008 SPD states that the "allocation of the proceeds of any recovery [from third-party tortfeasors] will be paid from the first dollar of any proceeds received and will have priority over competing claims, regardless of whether the total amount of your recovery is less than the actual loss suffered, for less than the amount necessary to make whole.  The Fund's rights will not be defeated or reduced by the application of any "Made-Whole Doctrine" . . . or any other doctrine purporting to defeat the Fund's right by allocating the proceeds exclusively, or in part, to non-medical expense damages."

still based these decisions on the principle that the benefits vest at the time the medical expenses were incurred, rather than at the time of the injury.  See Member Sycs. Life Ins. Co. v. American Nat'l Bank and Trust CO. of Sapulpa, 130 F.3d 950, 954 (10th Cir. 1997) (finding that where "the medical expenses [the plan] seeks to recoup were incurred and paid, and therefore vested, before the plan was modified by the 1993 amendment . . . retroactive application of the amendment [creating a subrogation right for the plan] in these circumstances would impermissibly destroy vested rights.").  Under the explicit terms of both the 2000 and 2008 Plans, ("Type of Plan: Employee Welfare Benefits Plan including hospital expense benefits, medical expense benefits, dental expense benefits, disability expense benefits, death expense benefits and accidental death and dismemberment expense benefits"), this is an expense plan; the beneficiary's rights vested at the time the medical expenses were paid.

Accordingly, the Fund's reimbursement claim for medical expenses paid in years covered by the 2008 SPD (2008-present)[17] are subject to the subrogation provisions of the Plan.

### D.  Equitable Relief under ERISA

Pursuant to ERISA §502(a)(3), a participant, beneficiary, or fiduciary is entitled to "appropriate equitable relief" to redress violations or to enforce any provisions of the terms of the plan.  Damages, or other legal remedies, are not recoverable under § 502(a)(3).  Mertens v. Hewitt Associates, 508 U.S. 248, 255-58 (1993).  Defendants argue that Plaintiff is not seeking "equitable relief" under ERISA § 502(a)(3).

---

[17] The Health Fund also seeks reimbursement for claims incurred during 2007, totaling $488,443.  These claims are governed by the 2000 SPD.  The 2000 SPD provides that "[i]n consideration of any benefit payments made by the Plan, an employee or dependent shall subrogate (assign) to the Plan his or her right of recovery against any person or organization and any action in tort to the extent of the amount of such employee's or dependent's claim."  This establishes an equitable lien over the personal injury settlements that the Health Fund seeks in its reimbursement claim for the self-insured medical expenses incurred in 2007.  The Health Fund is entitled to reimbursement of the claims incurred in 2007 totaling $488,443.

In Great-West Live & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 213 (2002) the Supreme Court held that a necessary characteristic of equitable restitution is that it impose a constructive trust or equitable lien on "particular funds or property in the defendant's possession." The Court found that the plaintiffs in Knudson were seeking legal relief—particularly, the imposition of personal liability on respondents for a contractual obligation to pay money— rather than equitable relief, and therefore their claim was not actionable under § 502(a)(3). Plaintiff was seeking to enjoin an "act or practice"—specifically, defendants' failure to reimburse the benefits plan in violation of the plan's terms. The Court found that an injunction to compel the payment of money past due under a contract, or specific performance of a past due monetary obligation, "was not typically available in equity." Id. at 205. Seeking restitution was not outcome determinative because it would be either a legal or an equitable remedy.

Further, the funds at issue in Knudson could not be considered "particular funds or property in the defendant's possession" because the funds were not in Knudson's possession, but rather had been placed in a "Special Needs Trust" under California law. The Court, therefore, found that the relief Great-West sought was "not equitable—the imposition of a constructive trust or equitable lien on particular property—but legal—the imposition of personal liability for the benefits that [Great-West] conferred upon [Knudson]." Id. at 214.

In Sereboff v. Mid-Atlantic Medical Services, Inc., 547 U.S. 356 (2006), the Supreme Court revisited the issue of equitable claims under ERISA § 502(a)(3). The Court focused on the "particular funds or property in the defendant's possession" that must be the subject of an equitable claim. Petitioners were beneficiaries under a health insurance plan administered by respondent Mid-Atlantic and covered by ERISA. The plan contained an "Acts of Third Parties"

17

provision, requiring a beneficiary who is injured as a result of an act or omission of a third party to reimburse Mid-Atlantic for benefits it pays on account of those injuries, if the beneficiary recovers for those injuries from a third party.  When the Sereboffs settled their tort suit, Mid-Atlantic filed suit in District Court pursuant to § 502(a)(3), seeking to collect the medical expenses that it had paid on their behalf from the Sereboff's tort recovery.

The Court determined that the relief sought was equitable in nature.  Id. at 362.  The funds sought by Mid Atlantic (that portion of the tort settlement due to Mid- Atlantic under the terms of the ERISA plan) were "specifically identifiable" and "within the possession and control of the Sereboffs," since the funds were preserved in the Sereboffs' investment accounts.  Id. at 362-363.  Since Mid Atlantic sought to impose a constructive trust or equitable lien on specifically identified funds, (rather than the Sereboffs' assets generally), the Court found that plaintiffs had successfully brought an equitable claim[18] pursuant to § 502(a)(3).

The Sereboff test with respect to the "specifically identifiable" fund mandate focused on plan language to determine whether a subrogation claim is an imposition of personal liability on the individual (and therefore prohibited under § 502(a)(3) as a legal claim), or whether it seeks to restore to the fund specifically identifiable property in the subragee's possession.  If it is the latter, the claim is equitable, not legal.

Defendants argue that the subrogation provision in the SPD creates only a contract claim for money damages, and therefore the Health Fund cannot be reimbursed pursuant to § 502(a)(3). Both the 2000 SPD and the 2008 SPD contain the following language:

> In consideration of any benefit payments made by the Plan, an employee or dependent shall subrogate (assign) to the Plan his or her right of recovery against any person or organization and any action in tort to the extent of the amount of such employee's or dependent's claim.  In other

---

[18] The Court declined to consider whether the "equitable" relief under § 502(a)(3) was "appropriate" because it contravened principles like the Make-Whole Doctrine.  Sereboff, 547 U.S. at 368 n. 2.

words, if someone negligently injures you and the Plan provides you with benefits to care for that injury, you must reimburse the Plan out of whatever you may recover from the wrongdoer.

Given this language[19], the Plaintiff has specified both the fund from which reimbursement to the plan is due ("recovery against any person or organization and any action in tort"), as well as the portion due to the Health Fund ("the amount of such employee's or dependent's claim."). The specifics included in the SPD plan language satisfy the requirements for an equitable ERISA claim. Popowski v. Parrott, 461 F.3d 1367, 1374 (11th Cir. 2006).

With regard to "possession", Defendants argue that the funds at issue in this case are not in "possession" of the Defendants for the purpose of § 502(a)(3), since the funds were placed in a supplemental needs trust. As such, the Defendants claim that Plaintiff has no equitable right of reimbursement from Amanda's settlement award.

Plaintiffs counter that the Health Fund has specifically identified a fund that is distinct from Defendants' assets, and therefore their subrogation claim is equitable as restitution in the form of a constructive trust. "Under the framework established in Sereboff, the Health Fund's SPD clearly and unambiguously creates the right to an equitable lien on the specific funds currently held in escrow by Defendant." Pl. Br. (4) at 7.

---

[19] Defendants attempt to make a distinction between "subrogation" and "reimbursement" in actions enforcing an equitable lien. See Def. Br. (1) at 16-17. Defendants argue that the SPD language creates "nothing more than the beneficiary's right of recovery against a third party, which is the very definition of subrogation." Id. at 16. However, Plaintiff correctly states that "nearly identical subrogation provisions commonly create a right to reimbursement or restitution", and courts enforce subrogation clauses by mandating that plans are "reimbursed." See Sereboff, 547 U.S. 356 (U.S. 2006) (allowing a health fund to be reimbursed through its subrogation provision); Manginaro v. Welfare Fund of Local 771, LA.T.S.E., 21 F.Supp.2d 284, 300 (S.D.N.Y. 1998) (where health fund "[sought] to enforce a contractual right to reimbursement for benefits paid to plaintiffs based on the Plan's subrogation clause."); Wilkins v. Mason Tenders Dist. Council Pension Fund, 445 F .3d 572, 581 (2d Cir. 2006) (using the terms subrogation and reimbursement interchangeably); McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 194 (2d Cir. 2007) (same). The subrogation clauses in the SPDs, therefore, provide the Health Fund the right to be reimbursed through the application of an equitable lien on the settlement funds. Any distinction between the two terms is not relevant to the interpretation of the Health Fund's rights pursuant to an equitable lien on Defendants' settlement funds.

Cases subsequent to <u>Knudson</u> and <u>Sereboff</u> are inconsistent as to whether funds in a Supplemental Needs Trust should be considered "in possession" of the beneficiary.  The New York State court specifically mandated the Defendant's award to be set-aside following the Fund's intervention.  Mr. Dinnigan is the Trustee of the Supplemental Needs Trust.  In these circumstances, it is not unreasonable to find that the funds are in the possession of the Defendant for the purposes of the subrogation analysis, and subject to the imposition of an equitable lien by the Health Fund.

Defendant Robert Dinnigan is the trustee of the Amanda Dinnigan Supplemental Needs Trust (the "Dinnigan Trust").  During a February 4, 2011 hearing in front of the Honorable Judge J. J. Jones, Jr., Defendant's attorney Alan Shapey (also a Defendant in this action) informed the court that Mr. Dinnigan had agreed to permit the Health Fund to intervene in the state court action for the purposes of pursuing a reimbursement claim for the medical expenses that the Health Fund paid to Amanda.  Mr. Shapey stated that the compromise before the court was that the sum of $1,224,758.11 (the amount requested by the Health Fund) would be held in an interest-bearing escrow account once Mr. Dinnigan received the settlement funds from Zurich Insurance Company pending a hearing by the court as to what rights of reimbursement, if any, the Health Fund has as against Amanda.  Judge Jones asked Mr. Dinnigan in open court if he consented to the settlement.  Mr. Dinnigan stated that he was in favor of the proposed settlement, including the intervention of the Health Fund and the separation of $1,224,758.11.  On February 23, 2011, pursuant to the Confidential Infant's compromise of Judge Jones, dated February 18, 2011 (Def. Rule 56.1 Stmt. at Ex. F), Mr. Shapey informed plaintiffs that $1,224,758.11 had been placed in an interest-bearing escrow account.

On March 27, 2012, the Honorable Thomas F. Whelan of the New York Supreme Court issued a Settlement Compromise Order between Mr. Dinnigan and the Third-Party Tortfeasors. The Settlement Compromise designates Robert Dinnigan as the trustee of the Supplemental Needs Trust of Amanda Dinnigan[20].  Mr. Dinnigan was ordered to post a $5 million bond with the Clerk prior to his receipt of any of the settlement funds, and maintain the bond by those settlement payments until further court order.  Judge Whelan describes the funds set aside in the escrow account as "equivalent to the amounts expended by the Health Plan from 2007 through December 31, 2010 for medical, pharmaceutical, and hospital services rendered to the infant plaintiff."  Settlement Compromise Order at 3 (Def. Rule 56.1 Statement at Ex. H).

Judge Whelan found that the state court did not have subject matter jurisdiction over the Health Fund's claim for reimbursement pursuant to 29 U.SC. §1132(a)(3), and dismissed both the Health Fund's claim for summary judgment pursuant to §1132(a)(3) and Mr. Dinnigan's cross-claim for summary judgment on the grounds that exclusive jurisdiction over such claims was in the federal district courts.  The court stated that the Dinnigans were entitled "to the release of and distribution to the Supplemental Needs Trustee [Mr. Dinnigan] of the previously segregated settlement funds on deposit in the escrow account upon compliance with the terms and conditions of this order and the further directives for any such release and distribution that are set forth in the compromise order to be entered herein."  Id. at 7.

Given the origin of the Dinnigan Special Needs Fund, the court must determine whether or not Mr. Dinnigan is in "possession and control" of the funds therein for the purpose of a subrogation analysis under ERISA §502(a)(3).  The funds in the Dinnigan Special Needs Trust are specifically identifiable as the funds intended for potential reimbursement of the Health

---

[20] The Dinnigan Special Needs Trust was established by Mr. Dinnigan and his wife in 2007.  March 27, 2012 Settlement Compromise Order at 3 (Def. Rule 56.1 Statement at Ex. H).

Fund.  Judge Whelan noted this explicitly when he stated that the funds set aside in the escrow account maintained by Mr. Shapey for the express purpose of potentially reimbursing the Health Fund were "equivalent to the amounts expended by the Health Plan from 2007 through December 31, 2010 for medical, pharmaceutical, and hospital services rendered to the infant plaintiff."  Settlement Compromise Order at 3.  The funds were then moved from this escrow account to the special needs fund based on the State court's lack of subject matter jurisdiction. This cannot negate the fact that these funds were set aside for a particular purpose, and were never out of the possession of Mr. Dinnigan or his attorneys.   Where the funds have been specifically identified in the SPD (as they have been in this case) and shown to be in possession of the defendant (demonstrated through Mr. Dinnigan's role as trustee of the Special Needs Trust), the requirements of Sereboff have been met, and the funds are subject to subrogation, if additional factors[21] indicate that subrogation is warranted.

Defendants maintain that the funds are not in their possession, citing Primax Recoveries, Inc. v. Carey.  247 F.Supp. 2d 337 (S.D.N.Y. 2002).  In Primax, however, the parties had not yet reached a settlement agreement with the third party tortfeasors, so the settlement proceeds could not be considered in the defendant's "possession."  Indeed the proceeds in Primax "are the entirely hypothetical fruit of a potential future settlement that does not yet exist and may never come into being at all."  Id. at 342 n. 5.

Here the Plaintiff has successfully designated "specifically identifiable funds" that, pursuant to Sereboff, are subject to subrogation according to equitable principles. Unlike Primax, where the settlement had yet to be achieved, the Dinnigans received a settlement agreement, Plaintiff intervened in the Dinnigans' action against third-party tortfeasors to participate in any

_____

[21] These additional factors include the potential application of equitable limitations, whether the health fund was self-funded or insured, and which SPD (2000 or 2008) should govern Plaintiff's claim.

settlement negotiations and protect its claim for covered expenses, and the court directed

Defendants' counsel to distribute the settlement funds from an escrow account to a Supplemental

Needs Trust of which Mr. Dinnigan was trustee.  Furthermore, Plaintiff intervened only after the

settlement had been approved by the state court judge.

On this record, the funds at issue are identifiable and in the possession of Defendants for

the purposes of an equitable lien analysis.  As such, Plaintiff's claim is equitable and was

appropriately made pursuant to ERISA § 502(a)(3).

### E.  Equitable Limitations Applicable to § 502(a)(3)

To recapitulate, the Court finds that: (1) the Plan is a self-insured plan, and therefore

preempts New York's anti-subrogation laws; (2) the 2008 SPD is applicable to cover medical

expenses that were incurred from 2008-2011, regardless of the fact that Amanda's injury

occurred before the 2008 SPD was in effect; and (3) Plaintiff is entitled to equitable relief

pursuant to ERISA §502(a)(3) because the funds in the supplemental needs trust are particularly

identifiable funds in the Defendants' possession.  But Defendants argue that, even if the

subrogation claim is equitable and there are specifically available funds, relief is limited to

"appropriate equitable relief."  In other words, Plaintiff is seeking assert that the claim should be

subject to equitable limitations of unjust enrichment and limited by the "made-whole" doctrine.

1.  *"Made-Whole" Doctrine*

Defendants also argue that, since the language of the Plan is ambiguous regarding issues

of subrogation and reimbursement, it is proper for the court to apply the made-whole doctrine in

"effecting the 'common-sense understandings and legal principles that the parties may not have

bothered to incorporate expressly but that operate as default rules to govern in the absence of a

clear expression of the parties' intent that they do not govern.'"  Def. Br. (1) at 19.  Defendants

claim that where there is ambiguity in a standard-form contract, the ambiguity should be construed against the party who drafted the contract.  If the made-whole doctrine is not to be applicable, the Plan document must clearly state that intent.  See e.g. Chandler v. State Farm Mut. Auto. Ins. Co., 598 F.3d 1115, 1118 (9th Cir. 2010) (citing Progressive West Ins. Co. v. Superior Court, 37 Cal.Rptr.3d at 434, 441 (2006)  ("an insurer may disclaim the made-whole rule in an insurance contract by using clear and specific language that indicates the parties' intent to permit the insurer to seek reimbursement even if the insured has not been made whole.").

It is indisputable that the 2008 Plan includes an explicit provision rejecting the application of the made-whole doctrine.[22]  Since the 2008 SPD was in effect when Defendants' medical expenses were incurred in 2008-2011, this SPD is applicable to these expenses, and Defendants need not be "made whole" before Plaintiffs are reimbursed for the expenses paid during that time period.  There is no ambiguity in the 2008 SPD, and Defendant's argument that the "plan language at issue is limited, confused, and lacking in any clear expression of intent" collapses in the face of the clear language of the 2008 Plan.  Def. Br. (3) at 5.

Even if the subrogation provision in the SPD were found to be ambiguous, contrary to Defendants' assertion, the Second Circuit has not adopted the made-whole doctrine as an automatic gap-filler.  Defendants' reliance on Primax is misplaced.  First, that case recognized that "explicit" language can provide that the "make-whole" doctrine is inapplicable.  Furthermore, the funds at issue in Primax were provided by an outside insurance company so that New York State law governing insurance was not preempted by ERISA.   While Defendants

---

[22] The 2008 SPD subrogation provision states that "[t]he allocation of the proceeds of any recovery will be paid from the first dollar of any proceeds received and will have priority over competing claims, regardless of whether the total amount of your recovery is less than the actual loss suffered, or less than the amount necessary to make you whole.  The Fund's rights will not be defeated or reduced by the application of any 'Made-Whole Doctrine' . . . or any other doctrine purporting to defeat the Fund's right by allocating the proceeds exclusively, or in part, to non-medical expense damages.  2008 SPD at 40.

cite the court's statement that "if the tort victim then had to reimburse the insurer out of the resulting judgment, the tort victim would not be fairly compensated for her injuries," that is not a reference to the "Made-Whole" Doctrine; but rather, the court is describing the unfairness that would result if Primax were permitted to be reimbursed from Carey's judgment award for medical expenses that, per the New York State collateral source rule, had already been deducted by the court.

The made-whole doctrine will not be applied to deny the the Fund's reimbursement claim for medical expenses paid before 2008.

   2. *Unjust Enrichment*

Defendants point to U.S. Airways v. McCutchen, 663 F.3d 671 (3d Cir. 2011), which found that equitable principles should guide a court's decision as to whether reimbursement to a health plan out of a beneficiary's tort recovery is "appropriate."    In McCutchen, plaintiff US Airways filed a claim for reimbursement of the $68,866 it provided for McCutchen's medical care out of the $110,000 award that he recovered.  McCutchen paid 40%  of this total in contingency fees and attorneys expenses, reducing his recovery to less than $66,000. McCutchen argued that it would be "unfair and inequitable to reimburse US Airways in full when he has not been fully compensated for his injuries, including pain and suffering . . . [and] that US Airways, which made no contribution to his attorneys' fees and expenses, would be unjustly enriched if it were granted reimbursement without any allowance for those costs . . ." Id. at 674.  The Third Circuit found that "it would be strange for Congress to have intended that relief under § 502(a)(3) be limited to traditional equitable categories, but not limited by other equitable doctrines and defenses that were traditionally applicable to those categories."  Id. at

676.  Citing 4 Palmer, Law of Restitution § 23.18 at 472[23], the court found that the written

benefit plan "is not inviolable," but is subject to equitable doctrine and principles, and may

undergo modification and equitable reformation under § 502(a)(3).  The court, "[a]pplying the

traditional equitable principle of unjust enrichment," found that "[e]quity abhors a windfall," and

that it "amount[ed] to a windfall" for the US Airways health plan to obtain reimbursement.  Id. at

679.  "Because the amount of the judgment exceeds the net amount of McCutchen's third-party

recovery, it leaves him with less than full payment for his emergency medical bills, thus

undermining the entire purpose of the Plan."  Id.  The Court has already determined that it is not

unjust enrichment for Plaintiff to seek reimbursement for the health care expenses it incurred on

behalf of the Dinnigans.  Indeed, Plaintiff owes that much to other plan beneficiaries.  But

acknowledging Plaintiff's right to proceed does not mean that Plaintiff is entitled to a free ride.

In seeking equity, Plaintiff must be prepared to do equity.

      Here the total recovery of approximately $14.1 million "amounts to only a small fraction

of the 'full value' of Amanda's claim.  In view of the modesty of the recovery in relation to the

enormity of the losses, any payment to the Health Fund out of Amanda's recovery would only

serve to unjustly enrich the Health Fund at Amanda's expense."  Def. Br. (1) at 25.  Plaintiff has

invested nothing in the recovery from the third party tortfeasors, and has not contributed to the

attorney's fees and expenses of $5 million.

      But for Defendants' efforts and legal fees and expenses incurred on behalf of the injured

girl, Plaintiff would have no funds from which to seek reimbursement.  In equity and conscience,

Plaintiff should bear its fair share of the fees and expenses incurred in creating the funds from

which Plaintiff seeks reimbursement.  Having considered the total recovery, the court allowed

---

[23] This section states that "the principle of unjust enrichment . . . should serve to limit the effectiveness of contract provisions which in terms provide for reimbursement out of the insured's tort recovery without regard to whether or the extent to which, that recovery includes medical expenses."

attorney's fees and expenses in the three legal actions which created the total settlement of $14.1 million, the Court determines that Plaintiff should contribute, as its fair share, 25% of the $1,692,371 it seeks for reimbursement, or $423,092.75. Since Defendants' attorneys have set their fees based on the total value of the settlement ($14.1 million), and have been fully compensated for their services, the $423,092.75 will be deducted from the amounts owed to Plaintiff, and such funds will remain in the trust created to address the continuing needs of Amanda Dinnigan.

## CONCLUSION

Defendant's Motion to Dismiss the Complaint is DENIED and Plaintiff's and Defendants' Motion for Summary Judgment are GRANTED in part and DENIED in part. The Clerk of the Court is directed to enter judgment for Plaintiff in the amount of $1,292,278. This is 75% of the medical expenses of $1,692,371 paid out by Plaintiff. The amount of $423,092.75 reflects Plaintiff's fair share of the attorneys' fees and expenses incurred in creating the total settlement Fund. The amount allowed here to cover the attorneys' fees and expenses is not payable to Defendants' attorneys, as they have already been fully compensated. The amount allowed for attorneys' fees so that Plaintiff bears its fair share is to remain in the trust created for the benefit of Ms. Dinnigan. The Clerk of Court is directed to terminate this case after the judgment is entered.

Dated: New York, New York
        November 21, 2012

SO ORDERED

PAUL A. CROTTY
United States District Judge

27